

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INDICTMENT |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO: 20 CR 424 |
| | ) | Title 15, United States Code, |
| MARGARET COLE, | ) | Sections 78dd-2 and 78ff(a); |
| DEBRA PARRIS, | ) | Title 18, United States Code, |
| DORAH MIREMBE, | ) | Sections 371, 1341, 1349, |
| | ) | 1956(a)(2)(A), 1956(h), and 2; |
| Defendants. | ) | Title 42, United States Code, |
| | ) | Section 14944 |

JUDGE OLIVER

**FILED**
AUG 1 3 2020
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

GENERAL ALLEGATIONS

At all times relevant to this Indictment:

***Relevant Entities and Individuals***

1.      "Adoption Agency" was an international adoption agency that facilitated intercountry adoptions from Uganda, Poland, and elsewhere for prospective adoptive parents in the United States. Adoption Agency had its principal place of business in Strongsville, Ohio, and was organized under the laws of Ohio. Adoption Agency was a "domestic concern," as that term is defined in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2(h)(1)(B).

2.      Defendant MARGARET COLE was a resident of Strongsville, Ohio, was the Executive Director of Adoption Agency, which she founded in or around 1991.

3.      Defendant DEBRA PARRIS was a United States citizen and worked for Adoption Agency, where she was responsible for managing aspects of Adoption Agency's Uganda program. PARRIS was a "domestic concern" as that term is defined in the FCPA, Title 15, United States

Code, Section 78dd-2(h)(1)(A). PARRIS was also an "employee" and an "agent" of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2.

4.       Defendant DORAH MIREMBE was a Ugandan citizen and resident who provided adoption-related services to Adoption Agency pursuant to a contract with Adoption Agency, and who provided legal representation and adoption-related services to Adoption Agency's clients in Uganda. MIREMBE was an "agent" of a "domestic concern," Adoption Agency, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2. MIREMBE was a co-owner of a law firm, "Law Firm A", which had an office in Kampala, Uganda.

5.       "Co-Conspirator 1" was a foreign national and United States legal permanent resident who provided consulting services to Adoption Agency related to Adoption Agency's intercountry adoption programs in Poland and elsewhere.

6.       Robin Longoria, who has been charged separately, was a United States citizen and worked for Adoption Agency, where she was responsible for managing aspects of Adoption Agency's Uganda program in coordination with PARRIS. Longoria was a "domestic concern" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A). Longoria was also an "employee" and an "agent" of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2.

***Overview of the Criminal Schemes***

7.       PARRIS, MIREMBE, and their co-conspirators engaged in, among other things, a criminal scheme to offer and pay bribes to Ugandan judges, Ugandan welfare officers, and other Ugandan officials to corruptly procure adoptions of Ugandan children in order to assist Adoption Agency with obtaining business and with directing business to Adoption Agency, MIREMBE, and others. PARRIS, MIREMBE, and their co-conspirators also lied to, and concealed material

2

information from, Adoption Agency clients—including concealing facts relating to the circumstances of the children to be adopted and concealing that the adoptions were procured through bribery and fraud—in order to obtain money from Adoption Agency clients. PARRIS, MIREMBE, and their co-conspirators also caused Adoption Agency's clients to submit fraudulent visa applications to the United States Department of State (the "State Department") in connection with certain adoptions.

8. PARRIS, COLE, and their co-conspirators engaged in, among other things, a criminal scheme to deceive authorities in the United States responsible for regulating intercountry adoptions about a scheme to transfer a child from Poland to PARRIS's relatives without verifying that PARRIS's relatives were eligible for intercountry adoption. COLE also lied to the Polish authority responsible for intercountry adoptions about the transfer of the child to PARRIS's relatives in an attempt to maintain Adoption Agency's ability to procure intercountry adoptions from Poland.

### *Relevant Laws and Regulations*

9. The Intercountry Adoption Act ("IAA") made it a crime for any person to knowingly and willfully make a false statement or misrepresentation about a material fact that is intended to influence a decision or action of an accrediting entity or an entity performing a central authority function in the United States or a foreign country. 42 U.S.C. Section 14944.

10. Adoption regulations further required that adoption agencies: (1) ensure that intercountry adoptions take place in the best interests of children; and (2) prevent the abduction, exploitation, sale, or trafficking of children. 22 C.F.R. Section 96.35.

11. The State Department had primary responsibility for adjudicating the visa applications of children coming to the United States in intercountry adoption. Through the visa

3

application review process, the State Department obtained information about how U.S. adoption agencies facilitated intercountry adoptions from Uganda, Poland, and elsewhere. The State Department could use this information to evaluate whether adoption agencies were complying with applicable regulations, as appropriate.

12.     The FCPA makes it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of influencing foreign officials, inducing foreign officials to take or omit certain acts, and securing an improper advantage in order to assist those classes of persons in obtaining or retaining business for, or directing business to, any person. 15 U.S.C. Section 78dd-1, *et seq.*

### Eligibility for Intercountry Adoption in Uganda

13.     Ugandan laws provided, among other things, that children should only be separated from their parents when a court determined that doing so would be beneficial to the child. Probation and social welfare officers ("welfare officers") in Uganda were responsible for identifying vulnerable children and, when appropriate, applying for judicial "care orders" that would authorize persons other than a child's parents to care for the child. To support a care order application, welfare officers were required to interview the child's parents, nearest relatives or guardians and then submit a written "welfare report" describing why the child was vulnerable.

14.     Magistrate Judges of the Family and Children's Court of Uganda ("Magistrate Judges") were required to review the welfare report and determine whether to issue a care order placing the child into an orphanage.

4

### *Intercountry Adoption from Uganda to the United States*

15.     Prospective adoptive parents from the United States that sought to adopt Ugandan orphans could do so by obtaining a guardianship order from the Family Division of the High Court of Uganda ("Ugandan High Court"), obtaining a visa to bring the child to the United States, and then bringing the child to the United States to complete the adoption.  At the Ugandan High Court, the court registrar was responsible for assigning each guardianship application to a judge.

16.     Guardianship applicants provided written submissions, including the welfare report and care order, to support their applications.  Ugandan High Court judges held hearings to adjudicate guardianship applications and issued guardianship orders in writing.  Once a prospective adoptive parent obtained a guardianship order, he or she would then apply to the State Department for an IR4 visa to bring the child to the United States.  The prospective adoptive parent was typically interviewed at the U.S. Embassy in Kampala, Uganda in connection with their prospective adoptee's visa applications.  The prospective adoptive parent was required, among other things, to provide truthful information about the circumstances by which the child was determined to be an orphan.

### *Details of the Uganda Criminal Schemes*

17.     In or around 2012, Adoption Agency started a program to facilitate adoptions of Ugandan children by prospective adoptive parents in the United States.  From at least 2012 to in or around 2016, PARRIS managed Adoption Agency's adoption program in Uganda in coordination with Longoria and others.

18.     In or around 2013, Adoption Agency entered into an agreement with MIREMBE to provide adoption-related services to Adoption Agency.  PARRIS selected MIREMBE for this role as Adoption Agency's foreign supervised provider in Uganda.  Adoption Agency, through

PARRIS and others, communicated frequently with MIREMBE about her work for Adoption Agency while it was in progress and provided her with instructions regarding the intercountry adoptions that she was facilitating for Adoption Agency clients. Adoption Agency, through PARRIS and others, directed its clients in the Uganda program to hire MIREMBE as their attorney for adoption-related proceedings. Adoption Agency, through PARRIS and others, also supervised MIREMBE's work, including by requiring her to provide detailed descriptions of the services she performed before receiving payment. Furthermore, federal regulations required Adoption Agency to adequately supervise MIREMBE or risk being debarred by the State Department.

19.    Between in or around 2013 and in or around 2016, PARRIS, MIREMBE, and others participated in criminal schemes (1) to bribe Ugandan government officials in order to corruptly procure adoptions of Ugandan children who PARRIS and MIREMBE knew had not been properly determined to be orphans or otherwise to be eligible for intercountry adoption; (2) to make material misrepresentations and to conceal material facts from Adoption Agency clients in order to obtain money from Adoption Agency clients, including, among other things, to conceal from Adoption Agency clients facts relating to the circumstances of the children to be adopted and the fact that PARRIS, MIREMBE, and their co-conspirators were procuring these adoptions through bribery and other improper means; (3) to wire money from the United States to Uganda, in part, to provide money for the bribes; and (4) to cause Adoption Agency's clients to submit fraudulent visa applications in connection with these adoptions. Many of the Ugandan children whose adoptions PARRIS and MIREMBE had procured through bribery and fraud were not properly determined to be orphans, and certain of the children were ultimately returned to their birth mothers in Uganda after Adoption Agency's clients came to believe that these birth mothers had not knowingly given their children up for adoption. During this same period, Adoption Agency, in collaboration with

6

MIREMBE, procured the adoption of more than 30 Ugandan children by U.S. clients. Adoption Agency received more than $900,000 from these clients. MIREMBE received more than $430,000 from Adoption Agency, as well as tens of thousands of dollars directly from Adoption Agency's clients for representing them in Uganda.

*PARRIS, MIREMBE, and their Co-Conspirators bribe Ugandan officials*

20.     PARRIS, MIREMBE, and their co-conspirators presented Ugandan children who had not yet been determined to be orphans to Adoption Agency's clients for potential adoption. PARRIS then authorized Adoption Agency to send funds to MIREMBE, knowing that MIREMBE would use these funds, in part, to bribe Ugandan government officials to corruptly cause the adoptions of these children. These bribes included bribes to the following individuals, each of whom was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A): (1) bribes to a welfare officer, so that the welfare officer would recommend that children be placed into orphanages without first ensuring that the children were actually orphaned or that putting them up for adoption was in their best interest;  (2) bribes to a Ugandan magistrate judge, so that the magistrate judge would issue care orders based on the corruptly procured welfare reports and place the children in an orphanage in the Kampala district of Uganda ("Kampala Orphanage A") that was willing to accept the children without inquiring into whether they were actually orphans; (3) bribes to court registrars to get them to assign cases to corrupt "adoption-friendly" judges; and (4) bribes to Ugandan High Court judges to obtain guardianship orders to permit Adoption Agency's clients to bring the children to the United States for adoption.

21.     For example, MIREMBE and others working at MIREMBE's direction used money from Adoption Agency to pay bribes to a welfare officer in the Kayunga district of Uganda

("Kayunga Welfare Officer 1") in exchange for Kayunga Welfare Officer 1 signing welfare reports that recommended placing children into an orphanage.  These corruptly procured welfare reports were not based on Kayunga Welfare Officer 1's independent determinations that these children had to be placed in an orphanage.  Rather, as PARRIS and MIREMBE knew and intended, Kayunga Welfare Officer 1 provided welfare reports for these children because MIREMBE and people working at MIREMBE's direction brought the children to Kayunga Welfare Officer 1 and paid bribes to Kayunga Welfare Officer 1 to corruptly obtain the welfare reports.

22.     MIREMBE, at times assisted by employees of Law Firm A who were working at her direction, drafted welfare reports and directed the employees to deliver them to Kayunga Welfare Officer 1.  Kayunga Welfare Officer 1 signed the welfare reports prepared by MIREMBE and the Law Firm A employees upon receiving cash bribes.  These welfare reports at times falsely overstated the children's need for care and orphan status.  For example, one welfare report falsely and fraudulently stated that the whereabouts of a child's father were unknown.

23.     In many instances, these welfare reports also often recommended that the children be placed in "Kampala Orphanage A," even though it was in the Kampala district of Uganda, which was approximately two hours away from the Kayunga district—the district that the children were from and where there were available orphanages.  MIREMBE steered the children to Kampala Orphanage A because MIREMBE knew that the director of Kampala Orphanage A would accept the children without scrutinizing whether the children had any alternatives for care. MIREMBE also steered the children to Kampala Orphanage A because the director of Kampala Orphanage A was willing to sign affidavits drafted by MIREMBE for submission to the Ugandan High Court without questioning them.

24.     PARRIS, MIREMBE and their co-conspirators caused Adoption Agency to wire funds from the Adoption Agency's Ohio-based account to bank accounts controlled by MIREMBE in Uganda for the purpose of promoting the bribery scheme and knowing that the funds would be used, in part, to fund the bribes to Ugandan officials.

*PARRIS, MIREMBE, and their Co-Conspirators provide false information to, and conceal material information from, Adoption Agency's clients*

25.     PARRIS and MIREMBE and their co-conspirators took steps to conceal, among other things: (1) the bribery scheme; (2) the fees associated with the bribery scheme that were charged to Adoption Agency clients; and (3) other material facts from Adoption Agency's clients in order to obtain money from Adoption Agency clients.

26.     For example, Adoption Agency sent invoices via email to Adoption Agency clients that falsely and fraudulently concealed the bribes to court registrars as "court filing fees." MIREMBE, and Law Firm A employees working at MIREMBE's direction, also sent invoices to Adoption Agency via email that—as PARRIS, MIREMBE and their co-conspirators knew— falsely described bribes to Ugandan Judges as "judge's fees."

27.     In or about October 2015, an Adoption Agency client asked PARRIS and others the reason Adoption Agency charged the client a "court filing fee." The client was not told the truth.

28.     Subsequently, in order to better conceal the money that Adoption Agency clients were being charged in order to fund the bribery scheme, PARRIS, and her co-conspirators began concealing the cost of the bribes within the "Foreign Program Fees" that were charged to Adoption Agency's clients. Adoption Agency clients in the Uganda program were often charged more than $10,000 each in "Foreign Program Fees."

9

29.     PARRIS, MIREMBE, and their co-conspirators also deceived Adoption Agency's clients about the circumstances of the children to be adopted, including by providing Adoption Agency clients with fraudulent welfare reports that were corruptly procured and by concealing that the children were not properly determined to be eligible for intercountry adoption.

30.     For example, on or about October 14, 2014, PARRIS called an Adoption Agency client and informed the client that a certain child was potentially available for adoption, even though PARRIS knew the child was not eligible to be referred for adoption at that time.  In or around February 2015, Adoption Agency sent a referral package via email to the Adoption Agency client that included the child's welfare report, which had been corruptly procured through bribery. The corruptly obtained welfare report falsely stated that the child's mother "is helpless [and] cannot provide the basic needs of the child."  The referral package also included a copy of a care order signed by a magistrate judge that was also corruptly obtained through bribery, and which recommended that the child be placed in the care of Kampala Orphanage A.

31.     After the Adoption Agency client completed the adoption of the child, and while the child was living in the Adoption Agency client's home in the United States, the Adoption Agency client came to believe that certain information she had received in the welfare report was false and that the child's birth mother had not knowingly given the child up for adoption.  The Adoption Agency Client coordinated with an individual residing in Uganda, who traveled to the child's home village on or about March 25, 2016, seeking additional information regarding the child's true background.  PARRIS learned of this visit and called Adoption Agency client within approximately one day.  PARRIS told the client, in sum and substance, that the client should not further inquire about the child's background and that the client was putting at risk Adoption Agency's ability to facilitate additional adoptions from the child's village.  Following this phone

call, the client obtained the services of a social worker in the United States to assess the child's best interests.

32.    In or around September 2016, the Adoption Agency client traveled with the child to Uganda, reunited the child with the child's birth mother, and relinquished parental rights over the child back to the child's birth mother. In total, in connection with the adoption of the child, the Adoption Agency client made three trips to Uganda, paid approximately $25,000 to Adoption Agency, paid more than $10,000 dollars to MIREMBE, paid more than $5,000 to an individual affiliated with MIREMBE and Law Firm A, and incurred thousands of dollars in additional expenses, including expenses to obtain social work services and legal services in the United States.

*PARRIS misrepresents and conceals additional*
*material information from an Adoption Agency client*

33.    In or around August 2015, PARRIS referred a Ugandan child to an Adoption Agency client for potential adoption. PARRIS falsely informed the Adoption Agency client that the child had not been adopted by another Adoption Agency client solely because the child wanted to be adopted into a home with a mother and a father, and PARRIS concealed from the Adoption Agency client, among other things: (1) that the other Adoption Agency client had adopted the child's sibling, but had chosen to abandon the child in Uganda after having obtained a guardianship order establishing custody over the child and spending weeks living with the child and the child's sibling in Uganda; and (2) that the welfare report for the child had been corruptly obtained through bribery.

34.    On or about December 28, 2015, PARRIS caused an Adoption Agency employee to send the Adoption Agency client an email, which, among other things, included the corruptly obtained welfare report as an attachment and requested that the Adoption Agency client pay

11

Adoption Agency $10,010 in connection with the adoption of the child, including $9,335 for the "Foreign Program Fee."

35.     On or about December 31, 2015, the Adoption Agency Client mailed a check from West Virginia to Adoption Agency's office in Strongsville, Ohio in the amount of $10,010. Adoption Agency deposited this check into the Adoption Agency's Ohio-based account on or about January 4, 2016.

36.     The Adoption Agency client traveled to Uganda in or around March 2016 to pursue the adoption of the child.  By that time, the Adoption Agency client had already paid Adoption Agency approximately $26,000 in connection with this potential adoption.  While in Uganda, the Adoption Agency Client learned that she had been misled by PARRIS about the circumstances under which the child had become available for adoption.

37.     In or around September 2016, the Adoption Agency learned that the Adoption Agency client described in Paragraphs 30 through 32 had repatriated a Ugandan adoptee to Uganda based on concerns that the child's birth mother was manipulated into giving her child up for adoption.  PARRIS was concerned that other Adoption Agency clients would do so as well, and that the repatriations would harm Adoption Agency's reputation.  In October 2016, Longoria tried to arrange a telephone call between PARRIS and the Adoption Agency client.  Longoria wrote, "[PARRIS] and I received some information this morning from Uganda that we need to share and discuss with you."   The Adoption agency client responded by asking Longoria to put any information in writing.  Longoria wrote to PARRIS, "Are you going to write to [the Adoption Agency client]?"  PARRIS responded, "No don't want to put on paper."

38.     In or around November 2016, the Adoption Agency client repatriated the child to Uganda based on concerns that the child's birth mother was manipulated into giving her child up for adoption.

*PARRIS, MIREMBE, and their Co-Conspirators cause their clients to submit false information to the State Department to conceal their marketing of children who have not been properly determined to be eligible for intercountry adoption*

39.     PARRIS, MIREMBE, and others also conspired to cause Adoption Agency's clients to provide false information and to submit false documents to the State Department, including the submission of corruptly obtained fraudulent welfare reports, in order to obtain the visas necessary to bring the adoptive children to the United States.

40.     For example, in or around May 2015, PARRIS, MIREMBE, and their co-conspirators caused the Adoption Agency client described in paragraphs 30 to 32 to submit the false and corruptly obtained welfare report to the State Department in order to procure an IR4 visa for the child.

41.     In another example, PARRIS, MIREMBE, and their co-conspirators created, and caused to be created, a welfare report for a child that falsely identified the wrong person as the child's birth mother and falsely stated that the child's biological father was deceased. MIREMBE further attempted to get an Adoption Agency client to submit to the State Department, in connection with obtaining an IR4 visa for the child, documents that falsely indicated that the correct birth mother for the child had been identified at the time that the Adoption Agency referred the child to the Adoption Agency client. PARRIS, in sum and substance, recommended that the

Adoption Agency client allow MIREMBE to submit the false documents to the State Department as part of the visa application.

42.    In another example, on or about May 19, 2015, MIREMBE emailed PARRIS and Longoria and instructed them to create false documents in association with an IR4 visa application to be submitted to the State Department by an Adoption Agency client because otherwise "it will be problematic at embassy." In response to the request, Longoria created documents falsely representing the date upon which Adoption Agency referred the child to the client in order to conceal the short amount of time child had been in the orphanage before being referred for intercountry adoption. Longoria, in coordination with PARRIS, provided the false and fraudulent documents to the client, and, on or about July 30, 2015, MIREMBE caused the client to submit the false and fraudulent documents to the State Department as part of the visa application.

### Intercountry Adoption from Poland to the United States

43.    At all times relevant to this Indictment, the Council on Accreditation ("COA") was the entity responsible for accrediting any agency in the United States that sought to provide intercountry adoption services. COA required accredited adoption agencies to provide annual certifications attesting that they were in substantial compliance with applicable regulations, and to timely report certain events, including dissolved adoptions and abuse of adoptees. COA also could suspend or cancel an adoption agency's accreditation to facilitate intercountry adoptions—if it was out of compliance with applicable laws, regulations, policies, or procedures.

44.    The Ministry of Family, Labor, and Social Policy (the "Polish Central Authority") was the Polish government agency that determined, among other things, whether an adoption service provider was permitted to facilitate intercountry adoptions in Poland. For each intercountry adoption from Poland, adoption service providers were required to transmit a home

study of prospective adoptive parents, which included a criminal background check on all adults living in the home, to the Polish Central Authority. The State Department was also required to send a letter to the Polish Central Authority indicating its approval for particular United States prospective adoptive parents to adopt particular Polish children. The State Department also had to approve a visa for the prospective adoptee to be brought to the United States for adoption.

45.     Adoption service providers were obligated to report any disruption or dissolution of an intercountry adoption to the Council on Accreditation within 30 business days. Adoption service providers were also required to report any disruption of an intercountry adoption from Poland to the Polish Central Authority.

### Details of the Poland Criminal Scheme

46.     Adoption Agency had established an adoption program in Poland in or around 2014. The Poland program was an important potential revenue source for COLE and Adoption Agency.

47.     Poland Client was a client of Adoption Agency who transferred into Adoption Agency's Poland program in or around 2015. Poland Client originally expressed a preference to adopt one child. In or around early 2015, after Adoption Agency informed Poland Client about the potential of adopting two siblings (Child 1 and Child 2), Poland Client initially agreed to adopt both siblings.

48.     On or about March 4, 2015, the State Department sent a letter to the Polish Central Authority that indicated the State Department's approval for Poland Client to adopt Child 1 and Child 2. The Polish Central Authority also received the completed home study for Poland Client that showed Poland Client's suitability to complete an intercountry adoption.

49.　In or around May 2015, Poland Client traveled to Poland.　In Poland, Co-Conspirator 1 was introduced to Poland Client as Adoption Agency's in-country representative. Over the course of weeks in Poland with Child 1 and Child 2, Poland Client developed concerns as to whether Poland Client could adequately meet the physical and emotional needs of both siblings.　Poland Client expressed that concern to Co-Conspirator 1.　In response, Co-Conspirator 1 told Poland Client that if Poland Client did not adopt both siblings, they would be "red-marked" and unlikely to be adopted by anyone else.　Co-Conspirator 1, in sum and substance, also told Poland Client to adopt both siblings and then, once in the United States, find another family in the United States to adopt Child 2.

50.　At around the time that Co-Conspirator 1 pressured Poland Client to adopt both siblings, Adoption Agency had approximately 40 pending clients in the Poland program.　These pending clients represented more than $1 million of potential revenue to Adoption Agency, and hundreds of thousands of dollars of potential revenue to Co-Conspirator 1's company.

51.　Poland Client contacted COLE for assistance.　In an email to COLE dated on or about June 21, 2015, Poland Client described the concerns about raising both Child 1 and Child 2. Poland Client expressed a strong desire to find another family to raise Child 2.　Poland Client also offered to travel to wherever in the United States that the other family resided to deliver Child 2 to that other family.

52.　After receiving no response from COLE, Poland Client emailed COLE again three days later and again expressed Poland Client's intention not to keep custody of Child 2.　Poland Client wrote to COLE, "I just want to follow up from my last email to see if there is anything [we] need to be doing to make the process run more smoothly for the dissolution."

53.     COLE identified for Poland Client a few persons who would potentially adopt Child 2, including Parris Relatives 1 and 2. COLE described Parris Relatives 1 and 2 as having a biological child close in age to Child 2, which Poland Client believed made them a good fit. On or about June 29, 2015, Poland Client emailed COLE, "We are hopefully coming home sometime this week and we need to make a plan . . . We both feel that we would prefer that [Child 2] is with [Parris Relatives 1 and 2] . . . Have [Parris Relatives 1 and 2] been working on their home study?" COLE never responded to that question.

54.     Poland Client, while still in Poland, was told that Parris Relatives 1 and 2 were relatives of PARRIS. Poland Client and PARRIS spoke multiple times by phone about Child 2. Based on these conversations, Poland Client understood that PARRIS expected that Parris Relatives 1 and 2 would permanently adopt Child 2. Poland Client and PARRIS agreed that Poland Client would travel from Poland to Texas with Child 1 and Child 2, where Poland Client would meet PARRIS at the airport and, through PARRIS, transfer Child 2 to Parris Relatives 1 and 2.

55.     On or about June 27, 2015, Poland Client's adoptions of Child 1 and Child 2 became final under Polish law.

56.     On or about July 1, 2015, Poland Client applied for United States visas for Child 1 and Child 2 and was interviewed at the United States Embassy in Warsaw, Poland. Poland Client, based on instructions from Co-Conspirator 1, did not mention that Poland Client had taken steps to transfer custody of Child 2 to another family upon arrival in the United States. Rather, the visa applications indicated that both Child 1 and Child 2 would live at Poland Client's home address. On or about July 2, 2015, Poland Client obtained visas for both siblings.

57.     On or about July 4, 2015, Poland Client traveled from Poland to Dallas/Fort Worth International Airport (DFW Airport) with Child 1 and Child 2. There, Poland Client met PARRIS,

who had arranged for an attorney in Texas to draft documentation related to the transfer of custody of Child 2 from Poland Client to Parris Relatives 1 and 2. PARRIS also arranged for Longoria to meet them at DFW Airport to notarize the signatures on the transfer of custody paperwork.

58.     Poland Client signed the documents at DFW Airport. PARRIS took Child 2 from Poland Client. Poland Client traveled to her home with Child 1. Parris Relative 2, who accompanied PARRIS to DFW but did not meet Poland Client, took custody of Child 2, who then lived with Parris Relatives 1 and 2.

59.     Adoption Agency had not obtained a home study or a criminal background check of Parris Relatives 1 and 2—although COLE, PARRIS, and Co-Conspirator 1 all knew that families pursuing intercountry adoptions from Poland were required to complete home studies and undergo background checks.

60.     In the months following July 4, 2015, Adoption Agency failed to inform the Council on Accreditation, the State Department, and the Polish Central Authority that it had facilitated the transfer of Child 2 from Poland Client to Parris Relatives 1 and 2, notwithstanding its obligation under federal regulations to do so. COLE and PARRIS knew, however, that Parris Relatives 1 and 2 continued to have custody of Child 2 and that Parris Relatives 1 and 2 intended for the arrangement to be permanent.

61.     On or about August 27, 2015, PARRIS sent an email to COLE and another Adoption Agency employee that contained a proposed entry by PARRIS for an Adoption Agency blog, in which PARRIS wrote, "[Parris Relatives 1 and 2] just adopted a young [child] from Poland . . . I had guided them through the process of international adoption on everything they could expect from this journey . . ."

62.     Parris Relatives 1 and 2 attempted to finalize the adoption of Child 2 under Texas law.  In order to do so, Parris Relative 2 provided a licensed clinical social worker with information about Parris Relative 2's criminal history, which included an arrest for domestic violence. PARRIS learned of Parris Relative 2's criminal history no later than in or around December 2015. Parris Relatives 1 and 2 completed the adoption of Child 2 under Texas law in or around February 2016.

63.     On or about April 18, 2016, in order to conceal the conduct related to the adoption of Child 2 by Parris Relative 1 and 2, COLE caused Adoption Agency to submit a false report to the Council on Accreditation related to the "disruption / dissolution" of the adoption of Child 2 (the "April 2016 COA Report").  The April 2016 COA Report contained the following false statements, among others: (1) that Poland Client initially transferred Child 2 to Parris Relatives 1 and 2 for respite (temporary) care; and (2) that the "disruption / dissolution" of the adoption of Child 2 occurred within 30 days of the report (on March 21, 2016), even though Parris Relatives 1 and 2 took custody of Child 2 in July 2015 and completed the adoption of Child 2 under Texas law of in February 2016.  The April 2016 COA Report also concealed that Parris Relatives 1 and 2 were relatives of an Adoption Agency employee.

64.     On or about August 10, 2016, PARRIS contacted a counselor for a social services agency who resided in Texas and was experienced in intercountry adoption ("Adoption Counselor") and told her that Child 2 required counseling.  On or about August 12, 2016, Parris Relative 1 informed Adoption Counselor that Child 2 had been injured.  Adoption Counselor told Parris Relative 1 that Child 2 must be taken for a medical exam before the counseling program could begin.

65.     Adoption Counselor discovered that Child 2 had been placed into the home of Parris Relatives 1 and 2 before they had completed a home study.  Adoption Counselor was concerned that PARRIS had not fully informed Adoption Counselor about the amount of time that Child 2 had been living in Parris Relative 1 and 2's home.

66.     On or about August 12, 2016, Adoption Counselor 1 reported Adoption Agency's actions related to Child 2 to the Council on Accreditation.

67.     Child 2 was taken to Cook Children's Hospital in Ft. Worth, Texas.  Medical staff identified significant injuries in several areas of Child 2's body.  Child 2's case was referred to the Texas Department of Family and Protective Services, which removed Child 2 from Parris Relative 1 and 2's home.  Child 2's case was also referred to the Denton Police Department.

68.     In or around late August 2016, the Denton Police Department informed Poland Client that Child 2 had been injured.  At around that same time, COLE contacted Poland Client. COLE expressed concern to Poland Client that Adoption Agency would no longer be able to complete adoptions in Poland because of the events concerning Child 2.

69.     On or about September 2, 2016, COLE submitted another report to the Council on Accreditation regarding the injury to Child 2 (the "September 2016 COA Report").  In the report, COLE wrote of Parris Relatives 1 and 2, "[t]he family in question is not a[n] [Adoption Agency] family."  COLE again concealed in the September 2016 COA Report that Parris Relatives 1 and 2 were related to PARRIS, and also concealed that Adoption Agency facilitated the transfer of Child 2 to them.

70.     On or about December 9, 2016, COLE received an email from the Polish Central Authority informing her that it had suspended Adoption Agency's accreditation in Poland.  It had done so because of what it had learned about the treatment of Child 2.

20

71.    Also on or about December 9, 2016, Parris Relative 1 wrote an email to PARRIS that falsely stated, "[We] were just temporary guardians of there [sic] four year old child from Poland until they decided what they wanted to do with the child until February 2016". PARRIS — knowing that Parris Relatives 1 and 2 took custody of Child 2 in July 2015 with the intent to permanently adopt the child — forwarded the false email to COLE.

72.    On or about December 11, 2016, COLE emailed a letter to the Polish Central Authority (the "December 2016 Letter"). In the December 2016 Letter, COLE made false representations and concealed material facts in an attempt to get Adoption Agency reinstated in Poland. In the December 2016 Letter, COLE, among other things: (1) falsely stated that Poland Client transferred Child 2 to Parris Relatives 1 and 2 in July 2015 for temporary care although Poland Client had repeatedly told COLE that she intended to transfer Child 2 to Parris Relatives 1 and 2 permanently; (2) concealed from the Polish Central Authority that Parris Relatives 1 and 2 were, as COLE knew, relatives of an Adoption Agency employee; and (3) concealed the role of herself, PARRIS, and Co-Conspirator 1 in arranging the transfer of Child 2 to Parris Relatives 1 and 2.

### COUNT 1
(Conspiracy to Violate the Foreign Corrupt Practices Act and to
Commit Visa Fraud, 18 U.S.C. Section 371)

The Grand Jury charges:

73.    The allegations set forth in paragraphs 1 through 72 are incorporated and re-alleged as though fully set forth herein.

### The Foreign Bribery and Visa Fraud Conspiracy

74.    From in or around 2013 to in or around 2016, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants DEBRA PARRIS and DORAH MIREMBE, together

21

with others both known and unknown to the Grand Jury, did knowingly and intentionally conspire, combine, confederate and agree to commit one or more offenses against the United States, to wit:

a.    being domestic concerns and employees and agents of domestic concerns, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to any person, while knowing that all and a portion of such money and thing of value would be offered, given, and promised, directly and indirectly, to a foreign official, for purposes of: (i) influencing any act and decision of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do any act in violation of the lawful duties of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and instrumentality thereof to affect and influence acts and decisions of such government and instrumentality, in order to assist Adoption Agency, PARRIS, and others known and unknown, in obtaining and retaining business for and with, and directing business to Adoption Agency, Law Firm A, MIREMBE, and others in violation of Title 15, United States Code, Sections 78dd-2 and 78ff(a); and

b.    to knowingly use, attempt to use, possess, obtain, accept, and receive any immigrant and nonimmigrant visa, permit, border crossing card, alien registration receipt card, and other document prescribed by statute or regulation for entry into and as evidence of authorized stay and employment in the United States, knowing it to be forged, counterfeited, altered, and falsely made, and to have been procured by means of any false claim and statement, and to have been otherwise procured by fraud and unlawfully obtained, in violation of Title 18, United States Code, Section 1546(a).

<u>Object of the Conspiracy</u>

a.     The object of the conspiracy was for the conspirators to unjustly enrich themselves and Adoption Agency by bribing Ugandan Government Officials to corruptly cause the adoption of Ugandan children in order obtain and retain business for Adoption Agency and others and to conceal the scheme by causing false information to be provided to the State Department in connection with visa applications for children adopted from Uganda.

<u>Manner and Means of the Conspiracy</u>

75.     The conspiracy was carried out through the following manner and means, among others:

a.     PARRIS, MIREMBE, and other co-conspirators communicated in person, via email, and on the telephone, regarding referrals of Ugandan children to Adoption Agency's clients as prospective adoptees although PARRIS and MIREMBE knew the children had not been properly determined to be eligible for intercountry adoption in Uganda.

b.     PARRIS, MIREMBE, and other co-conspirators communicated in person, via email, and on the telephone, regarding their plan to pay bribes to Ugandan government officials to influence them to misuse their official positions to cause the adoption of Ugandan children by Adoption Agency's clients.

c.     PARRIS, MIREMBE, and other co-conspirators communicated in person, via email, and on the telephone the manner and means by which they would obtain funds to pay bribes to Ugandan government officials, including sending funds from the United States to Uganda via wire transfer.

23

d.     PARRIS, MIREMBE, and other co-conspirators communicated in person, via email, and on the telephone, regarding their scheme to provide false information to the State Department that it would rely on in its adjudication of visa applications.

e.     PARRIS, MIREMBE, and other co-conspirators used instrumentalities of interstate commerce to execute their scheme, including making payments that were used for the bribes through international wire transfers, making false and fraudulent statements over email, and transmitting false and fraudulent documents over email.

<u>Overt Acts</u>

76.     In furtherance of the conspiracy, and to affect the objects thereof, PARRIS, MIREMBE, and others, committed the following overt acts, among others, in the Northern District of Ohio, Eastern Division, and elsewhere:

a.     On or about May 19, 2015, PARRIS and MIREMBE, in coordination with Longoria and others, caused approximately $16,300 to be wired from the Adoption Agency Ohio-based account to a bank account controlled by MIREMBE in Uganda in response to a request from MIREMBE for, among other things, approximately $1,500 for three "court filing fee[s]."

b.     On or about May 19, 2015, MIREMBE emailed PARRIS and Longoria and instructed them to create false documents for an Adoption Agency client because otherwise "it will be problematic at embassy."

c.     On or about September 22, 2015, PARRIS and MIREMBE, in coordination with Longoria and others, caused approximately $2,000 to be wired from the Adoption Agency Ohio-based account to a bank account controlled by MIREMBE in Uganda in response to a request for approximately $2,000 for five "court filing fee[s]."

d.      On or about November 4, 2015, PARRIS and MIREMBE, in coordination with Longoria and others, caused approximately $19,400 to be wired from the Adoption Agency Ohio-based account to a bank account controlled by MIREMBE in Uganda in response to a request for, among other things, approximately $1,600 for four "court filing fee[s]."

e.      On or about November 14, 2015, MIREMBE emailed PARRIS regarding her attempt to cause false documents to be submitted to the State Department by an Adoption Agency client in connection with a visa application for a Ugandan child.

f.      On or about March 17, 2016, PARRIS and MIREMBE, in coordination with Longoria and others, caused approximately $15,579 to be wired from the Adoption Agency Ohio-based account to a bank account controlled by MIREMBE in Uganda in response to a request for, among other things, approximately $4,107 for "Judge's fees for hearing."

All in violation of Title 18, United States Code, Section 371.

### COUNTS 2 THROUGH 4
(Foreign Corrupt Practices Act, 15 U.S.C. Sections 78dd-2 and 78ff(a); 18 U.S.C. Section 2)

The Grand Jury further charges:

77.     The allegations set forth in paragraphs 1 through 72, 75, and 76, are incorporated and re-alleged as though fully set forth herein.

78.     On or about the dates set forth below, in the Northern District of Ohio, Eastern Division, and elsewhere, DEBRA PARRIS and DORAH MIREMBE, being domestic concerns and employees and agents of domestic concerns, did willfully use and cause to be used and aid, abet, counsel, command, induce, and procure the use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person, while knowing that all or a portion of

25

such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Adoption Agency, PARRIS, and others known and unknown, in obtaining and retaining business for and with, and directing business to Adoption Agency, Law Firm A, MIREMBE, and others, as follows:

| COUNT | APPROXIMATE DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE AND INTERNATIONAL COMMERCE |
|---|---|---|
| 2 | September 22, 2015 | Longoria, while in Texas, sent an email to Adoption Agency employees in the Northern District of Ohio directing Adoption Agency to pay $2,000 to MIREMBE. |
| 3 | November 2, 2015 | Longoria, while in Texas, sent an email to Adoption Agency employees in the Northern District of Ohio directing Adoption Agency to pay $19,400 to MIREMBE. |
| 4 | March 15, 2016 | Longoria, while in Texas, sent an email to Adoption Agency employees in the Northern District of Ohio directing Adoption Agency to pay $13,609 to MIREMBE. |

All in violation of Title 15, United States Code, Sections 78dd-2 and 78ff(a), and Title 18, United States Code, Section 2.

COUNT 5
(Conspiracy to Commit Mail and Wire Fraud, 18 U.S.C. Section 1349)

The Grand Jury further charges:

79.     The allegations set forth in paragraphs 1 through 72, 75, and 76 are incorporated and re-alleged as though fully set forth herein.

The Scheme to Defraud

80.     From in or around 2013 through in or around 2016, in the Northern District of Ohio,

Eastern Division, and elsewhere, Defendants DEBRA PARRIS and DORAH MIREMBE, and

others both known and unknown to the Grand Jury, did knowingly and intentionally combine,

conspire, confederate, and agree with each other, and with others both known and unknown, to

knowingly, and with the intent to defraud, devise and intend to devise a scheme and artifice to

defraud, and to obtain money and property by means of materially false and fraudulent pretenses,

representations, and promises, knowing that the pretenses, representations, and promises were

false and fraudulent when made, and for the purpose of executing such scheme and artifice, (1) to

cause to be placed in any post office and authorized depository for mail a matter which was to be

sent and delivered by the United States Postal Service and private and commercial interstate

carrier, in accordance with the directions thereon, in violation of Title 18, United States Code,

Section 1341, and (2) to transmit and cause to be transmitted, by means of wire communication in

interstate commerce, writings, signs, signals, pictures, and sounds, in violation of Title 18, United

States Code, Section 1343.

Object of the Mail and Wire Fraud Conspiracy

81.     The object of the conspiracy was for PARRIS, MIREMBE, and their co-

conspirators to obtain money for Adoption Agency and Law Firm A from clients for adoption

services through false pretenses, representations, and promises, including, among other things,

deceiving Adoption Agency and Law Firm A's clients about the circumstances of the children to

27

be adopted, about the bribes paid to Ugandan officials, and about the fees being charged to the clients in order to fund the bribery scheme.

<u>Manner and Means of the Mail and Wire Fraud Conspiracy</u>

82.     The conspiracy was carried out through the following manner and means, among others:

a.     PARRIS, MIREMBE, and other co-conspirators communicated in person, via email, and on the telephone, regarding referrals of Ugandan children to Adoption Agency's clients as prospective adoptees although PARRIS and MIREMBE knew the children had not been properly determined to be eligible for intercountry adoption in Uganda.

b.     PARRIS, MIREMBE, and other co-conspirators sent, and caused to be sent, corruptly procured welfare reports to Adoption Agency's clients via email.

c.     PARRIS, MIREMBE, and other co-conspirators had communications with Adoption Agency clients via email and on the telephone in which they concealed material information from, and made material misrepresentations to, Adoption Agency clients about the circumstances of children to be adopted.

d.     PARRIS, MIREMBE, and other co-conspirators had communications with Adoption Agency clients via email and on the telephone in which they concealed material information from, and made material misrepresentations to, Adoption Agency clients about the circumstances of children to be adopted.

e.     PARRIS, MIREMBE, and other co-conspirators deceived and intended to deceive Adoption Agency's clients via email and on the telephone about the manner in which the clients' fees were spent in Uganda, including the use of those fees by MIREMBE and others to pay bribes to Ugandan government officials.

f.     PARRIS, MIREMBE, and other co-conspirators caused false and fraudulent invoices to be sent to Adoption Agency and Adoption Agency Clients via email that falsely described and concealed charges related to the scheme to bribe Ugandan officials, including by falsely identifying bribes as "court filing fees" and "Judge's Fees".

g.     PARRIS, MIREMBE, and other co-conspirators caused Adoption Agency Clients and Law Firm A clients to make payments to Adoption Agency and Law Firm A via wire and through the mail as a result of their scheme to defraud.

All in violation of Title 18, United States Code, Section 1349.

COUNT 6
(Mail Fraud, 18 U.S.C. Sections 1341 and 2)

The Grand Jury further charges:

83.     The allegations set forth in paragraphs 1 through 72, 75, 76, 81, and 82, are incorporated and re-alleged as though fully set forth herein.

The Scheme to Defraud

84.     Between in or around 2015 and in or around 2016, Defendant DEBRA PARRIS devised and intended to devise a scheme and artifice to defraud an Adoption Agency client, and for obtaining money and property by means of false or fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, to wit: Defendant DEBRA PARRIS, with the intent to defraud, concealed from an Adoption Agency client material information regarding the payment of bribes to Ugandan government officials, and concealed from the Adoption Agency client material information regarding the circumstances of the child to be adopted, including the fact that the child had been

29

abandoned by another Adoption Agency client, in order to obtain money and property from the Adoption Agency client in connection with the adoption of the child.

### Execution of the Scheme to Defraud

85.     On or about December 31, 2015, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant DEBRA PARRIS, for the purpose of executing the scheme to defraud described above, and attempting to do so, knowingly aided, abetted and caused to be placed in any post office and authorized depository for mail a matter which was to be sent and delivered by the United States Postal Service and private and commercial interstate carrier, in accordance with the directions thereon, to wit: a payment by check of $10,010 sent by mail from the Adoption Agency client in West Virginia to Adoption Agency in Strongsville, Ohio.

All in violation of Title 18, United States Code, Sections 1341 and 2.

### COUNT 7
(Conspiracy to Commit Money Laundering, 18 U.S.C. Section 1956(h))

The Grand Jury further charges:

86.     The allegations set forth in paragraphs 1 through 72, 75, 76, 81, and 82, are incorporated and re-alleged as though fully set forth herein.

### The Money Laundering Conspiracy

87.     From in or around 2014, to in or around 2016, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants DEBRA PARRIS and DORAH MIREMBE, did knowingly and intentionally combine, conspire, and agree with each other and with others known and unknown to the Grand Jury to commit an offense against the United States, in violation of Title 18, United States Code, Section 1956(a)(2)(A), to wit: to knowingly transport, transmit, and transfer, and attempt to transport, transmit and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the

30

United States from and through a place outside the United States with the intent to promote the carrying on of a specified unlawful activity, that is, (a) a violation of the Foreign Corrupt Practices Act, 15 U.S.C. Sections 78dd-2 and 78ff(a), and (b) an offense against a foreign nation (Uganda) involving bribery of a public official.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS 8 THROUGH 10
(Money Laundering, 18 U.S.C. Sections 1956(a)(2)(A) and 2)

The Grand Jury further charges:

88.     The allegations set forth in paragraphs 1 through 72, 75, 76, 81, and 82, are incorporated and re-alleged as though fully set forth herein.

89.     On or about the approximate dates listed below, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants DEBRA PARRIS and DORAH MIREMBE did transfer funds and attempt to transfer funds, in the approximate amounts listed below, from a place in the United States to a place outside the United States intending that each of the transactions, in whole or in part, promote the carrying on of a specified unlawful activity, that is, (a) a violation of the Foreign Corrupt Practices Act, 15 U.S.C. Sections 78dd-2 and 78ff(a), and (b) an offense against a foreign nation (Uganda) involving bribery of a public official, each transaction constituting a separate count:

| Count | Approximate Date | Monetary Transaction |
|-------|------------------|----------------------|
| 8 | September 22, 2015 | Wire transfer in the amount of $2,000 from Adoption Agency's bank account in Ohio to a bank account in Uganda for the purpose of paying Ugandan government officials to promote the carrying on of the bribery scheme. |
| 9 | November 2, 2015 | Wire transfer in the amount of $19,400 from Adoption Agency's bank account in Ohio to a bank account in Uganda for the purpose of paying Ugandan government officials to promote the carrying on of the bribery scheme. |
| 10 | March 17, 2016 | Wire transfer in the amount of $15,579 from Adoption Agency's bank account in Ohio to a bank account in Uganda for the purpose of paying Ugandan government officials to promote the carrying on of the bribery scheme. |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

<u>COUNT 11</u>
(Conspiracy to Defraud the United States, 18 U.S.C. Section 371)

The Grand Jury further charges:

90.     The allegations set forth in paragraphs 1 through 72 are incorporated and re-alleged as though fully set forth herein.

<u>The Conspiracy to Defraud the United States</u>

91.     From in or around June 2015 to in or around at least December 2016, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants MARGARET COLE and DEBRA PARRIS, together with Co-Conspirator 1 and others, did knowingly and intentionally combine, conspire, confederate, and agree with each other, and with others both known and

32

unknown to the Grand Jury, to defraud the United States, and one of its agencies and departments, by dishonest means.

## The Object of the Conspiracy

92.     The object of the conspiracy was to impair, obstruct, and defeat the lawful governmental functions of the United States by dishonest means in order to (1) enable COLE and PARRIS to cause the transfer of Child 2 from Poland Client to Parris Relatives 1 and 2, in contravention of the laws governing intercountry adoption; (2) conceal the role of COLE, PARRIS, and Adoption Agency in said transfer of Child 2, in order to maintain Adoption Agency's accreditation from the Council on Accreditation to facilitate intercountry adoption in the United States; and (3) to continue to facilitate intercountry adoptions in Poland.

## Manner and Means of the Conspiracy

93.     The conspiracy was carried out through the following manner and means, among others:

a.     COLE, PARRIS, Co-Conspirator 1, and others communicated in person, via email, and on the telephone to arrange and carry out their scheme to cause Poland Client to adopt both Child 1 and Child 2 in Poland and then transfer custody of Child 2 to Parris Relatives 1 and 2 upon arrival in the United States without disclosure to the proper authorities.

b.     COLE, PARRIS, Co-Conspirator 1, and others caused material misstatements to be made to, and material facts to be concealed from, the State Department.

c.     COLE, PARRIS, and Co-Conspirator 1, and others used instrumentalities of interstate commerce to execute their scheme, including transmitting false and fraudulent documents over email and through an online web portal to the Council on Accreditation.

33

Overt Acts

94.     In furtherance of the conspiracy, and to affect the objects thereof, MARGARET COLE, DEBRA PARRIS, Co-Conspirator 1, and others, committed the following overt acts in the Northern District of Ohio, Eastern Division, and elsewhere:

a.      On or about July 2, 2015, Co-Conspirator 1 caused Poland Client to obtain visas from the State Department for Child 1 and Child 2 without Poland Client disclosing to the State Department that Poland Client had taken steps to transfer custody of Child 2 to Parris Relatives 1 and 2 upon arrival in the United States.

b.      On or about July 4, 2015, PARRIS traveled to DFW Airport to facilitate the transfer of Child 2 to Parris Relatives 1 and 2.

c.      On or about April 18, 2016, COLE caused the submission of the false April 2016 COA Report to the Council on Accreditation.

d.      On or about September 2, 2016, COLE caused the submission of a report to the Council on Accreditation that concealed that Parris Relatives 1 and 2 were relatives of an Adoption Agency employee, and that concealed that Adoption Agency coordinated the transfer of custody of Child 2 from Poland Client to Parris Relatives 1 and 2.

e.      On or about December 9, 2016, PARRIS forwarded an email from Parris Relative 1 to COLE that contained a false representation regarding Parris Relative 1 and 2's custody of Child 2.

All in violation of Title 18, United States Code, Section 371.

<u>COUNT 12</u>
(False Statement to the Council on Accreditation, 42 U.S.C. Section 14944)

The Grand Jury further charges:

95.     The allegations set forth in paragraphs 1 through 72, and 92 through 94, are incorporated and re-alleged as though fully set forth herein.

96.     On or about April 18, 2016, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant MARGARET COLE knowingly and willfully made a false and fraudulent statement and misrepresentation with respect to a material fact intended to influence and affect a decision and action by an accrediting entity with respect to the accreditation of an agency, to wit: COLE caused the submission of a false and fraudulent report to the Council on Accreditation that, among other things, falsely represented that Adoption Agency complied with the requirement to report any dissolution or disruption within 30 days of its occurrence, and falsely represented that Parris Relatives 1 and 2 took custody of Child 2 for respite care.

In violation of Title 42, United States Code, Section 14944.

<u>COUNT 13</u>
(False Statement to the Polish Central Authority, 42 U.S.C. Section 14944)

The Grand Jury further charges:

97.     The allegations set forth in paragraphs 1 through 72, and 92 through 94, are incorporated and re-alleged as though fully set forth herein.

98.     On or about December 11, 2016, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant MARGARET COLE knowingly and willfully made a false and fraudulent statement and misrepresentation with respect to a material fact intended to influence and effect a decision and action by an entity performing a central authority function, to wit: COLE caused the submission of a false and fraudulent letter to the Polish Central Authority that, among

35

other things, falsely represented that Parris Relatives 1 and 2 took custody of Child 2 for temporary care; concealed that Parris Relatives 1 and 2 were related to an Adoption Agency employee; and concealed the role of COLE and PARRIS in arranging the transfer of Child 2 to Parris Relatives 1 and 2.

In violation of Title 42, United States Code, Section 14944.


A TRUE BILL.


Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.